*FILED*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

*03 MAR 10 AM 11: 07*
*U.S. DISTRICT COURT*
*N.D. OF ALABAMA*

| | | |
|---|---|---|
| JENNIFER L. FORRESTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 01-JEO-2092-S |
| | ) | |
| IN-TERMINAL SERVICES | ) | |
| CORPORATION, | ) | **ENTERED** |
| | ) | |
| Defendant. | ) | MAR 1 0 2003 |

## MEMORANDUM OPINION

The plaintiff, Jennifer Forrester ("Forrester" or "the plaintiff"), an employee of

In-Terminal Services Corporation ("ITS" or "the defendant"), asserts various claims against ITS,

including that it violated the Equal Pay Act ("EPA") and engaged in gender discrimination by

paying her less money than her male counterparts, in violation of Title VII of the Civil Rights

Act of 1964, 42 U.S.C. § 2000e, *et seq.* Presently before the court is the defendant's motion for

summary judgment on the plaintiff's Title VII claim (doc. 20) and the defendant's motion to

strike portions of affidavit of Patrick McMurray ("McMurray") (doc. 25). Upon due

consideration, the motion to strike is due to be granted in part and denied in part and the motion

for summary judgment is due to be granted.

## FACTS[1]

ITS operates and manages a Burlington Northern Sante Fe ("BNSF") railroad terminal in

Birmingham, Alabama. BNSF contracts with ITS for operation and management services at the

---

[1] The facts set out below are gleaned from the parties' submissions and are viewed in a light most favorable to the plaintiff. They are the "'facts' for summary judgment purposes only. They may not be the actual facts. *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994)." *Underwood v. Life Insurance Co. of Georgia*, 14 F. Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

*33*

facility.  These services involve the transportation and movement of railway containers and trailers from rail cars, arranging on-time departures for outbound trains, and seeing that inbound trains are deramped in a safe and timely manner.  (Craig Huston Dep. (hereinafter "Huston Dep.") at 27).[2]  The defendant also repairs containers and trailers, operates equipment on the terminal grounds, and conducts computer operations.  (*Id*. at 19).  All these services require the maintenance of a positive working relationship with BNSF as the customer.  (*Id*.).

The loading and unloading of railroad containers and trailers is accomplished by a crew of ten to twelve hourly wage employees who are generally classified as laborers and maintenance personnel.  (Steve Cooper Dep. (hereinafter "Cooper Dep.") at 7-8; Huston Dep. at 25).[3]  The ground crew is supervised by a ramp coordinator, who is also known as an operations manager.[4]  (Huston Dep. at 25).  The operations manager generally is responsible for the supervision of the loading and unloading of the trains and the individuals involved in those activities.  (*Id*.).  The task involves managing the crew, monitoring inbound and outbound trains via a computer, and monitoring the inflow and outflow of trucks at the terminal to ensure that all the trailers and containers timely reach their proper destination.  (Huston Dep. at 27).

During the commencement of the relevant period, ITS employed five operations managers, including the plaintiff.  Two managers worked the day shift, two worked the night shift, and one worked as a "floater," covering the other managers time off and sick leave.  (Cooper Dep. at 12).

_____

[2] This deposition is located at document 21, exhibit 6.

[3] Cooper's deposition is located at document 21, exhibit 7.

[4] The terms are used interchangeably herein.

The plaintiff began her employment in the railroad industry in January 1993 with Eagle Systems as a billing supervisor. (Jennifer Forrester Dep. (hereinafter "Forrester Dep.") at 18-19).[5] After four or five months, she transferred to Welco, a division of Eagle Systems, as a dispatcher. (*Id.* at 23-24). She transferred because the dispatcher position paid more than her other job. (*Id.*). Her duties included verifying the units on hand and where they were to be sent and making sure they timely were dispatched and arrived at their destination. (*Id.* at 26). She did some of this through the use of a computer and computer records. (*Id.*). After approximately one and one-half years, the plaintiff was assigned primarily administrative duties. (*Id.* at 30, 34-35). In May 1997, Welco lost its contract with BNSF and the plaintiff was laid off. (*Id.* at 40).

The plaintiff was hired by Patrick McMurray, the terminal manager for ITS, in July 1997. (Forrester Dep. at 51). She was familiar with McMurray because he had previously worked with Eagle Systems and he was hired by ITS when it took over the terminal contract with BNSF. (Forrester Dep. at 53; McMurray Aff. at ¶ 3).[6] The plaintiff was hired as an operations manager. (Forrester Dep. at 53). After serving a 90-day probationary period, her salary was set at $27,000.00. (Forrester Dep. at 61-65). She received a pay increase to $27,540.00 in June 1999. She received another increase in May 2000 to $28,080.00. Her final, relevant increase was in May 2001 when her salary was increased to $34,000.00.

### Comparators

The plaintiff asserts that Steven Cooper ("Cooper") and Tommy Smith ("Smith"), who

---

[5] Her deposition is located at document 21, exhibit 5.

[6] McMurray's affidavit is located at document 24, tab 1.

3

were also employed during the relevant period as operations managers, are similarly situated for comparison purposes.  Cooper was hired in November 1997 as a terminal operator.  (Huston Dep. at Ex. 5).  He worked as a trailer mechanic, terminal operator, and lead terminal operator until August 1998 when he was promoted to operations manager at a salary of $27,000.00.  (*Id.*). He received an increase in June 1999 to $27,540.00[7] and another increase to $34,008.00 in August 1999.[8]  (*Id.*).  He was made a terminal manager in May 2001.  (*Id.*).

Smith was hired in July 1999 as an operations manager.  He was paid $27,000.00. (Huston Dep. at Ex. 4).  His salary was increased in August 2000 to $34,000.00.  (*Id.*).  He was terminated in May 2001.  (*Id.*).

A third male operations manager, Randy Ballard, was hired in September 2000.  (Huston Dep. at Ex. 4).  He was paid $27,000.00.  (*Id.*).  His salary was increased to $34,492.00 in May 2001.  (*Id.*).

## MOTION TO STRIKE PORTIONS OF MCMURRAY'S AFFIDAVIT

### Generally

The defendant asks the court to strike portions of McMurray's affidavit which was offered by the plaintiff in opposition to the motion for summary judgment.  The defendant asserts that it fails to meet the requirements of Rule 56 of the FEDERAL RULES OF CIVIL PROCEDURE.

Rule 56(e) states, in pertinent part, that affidavits in support of or in opposition to a motion for summary judgment ". . . shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is

---

[7] He was making $13.24 per hour.

[8] His pay was increased to $16.35.

competent to testify to the matters stated therein." FED. R. CIV. P. 56(e). If a supporting or opposing affidavit fails to conform to Rule 56(e), the opposing party may move to strike the nonconforming portion or portions. *Ali v. City of Clearwater*, 915 F. Supp. 1231, 1236 (M.D. Fla. 1996), citing *Interfase Marketing, Inc. v. Pioneer Technologies Group, Inc.*, 1993 WL 229601, *2 (M.D. Fla. June 23, 1993), *Barnebey v. E.F. Hutton & Co.*, 715 F. Supp. 1512, 1529 (M.D. Fla. 1989)).

The defendant asserts in its motion to strike that portions of the affidavit are due to be struck because (1) they are not based on personal knowledge, (2) they are not relevant, (3) they constitute inadmissible hearsay, and (4) they are conclusory.

### Discussion Regarding the Purportedly Objectionable Portions

The first sentence at issue provides ". . . I was not aware of any problems Forrester had with managing the crew or of the crew refusing to take direction from Forrester." (Doc. 25 at 4, quoting McMurray Aff. at ¶ 5). The defendant argues that this sentence is due to be struck because it is not based upon personal knowledge and because it is irrelevant. (Doc. 25 at 4). The Eleventh Circuit Court of Appeals recently stated that "[t]he Rules are clear: 'Supporting and opposing affidavits *shall* be made on personal knowledge.' FED. R. CIV. P. 56(e)." *Pace v. Capobianco*, 283 F.3d 1275, 1278-1279 (11th Cir. 2002) (emphasis in original).

McMurray was employed by the defendant as a terminal manager from July 7, 1997, until October 5, 1998. He was demoted to the position of operations manager on June 14, 1999, and served in that position until he voluntarily left his employment with the defendant on September 10, 1999. (Doc. 24 at Ex. 1 & 3). Thus, to the extent his testimony is intended to reflect personal knowledge thereafter, it is due to be struck. The court further finds, however, that the

5

evidence, as offered, is irrelevant. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." FED. R. EVID. 401. In view of the defendant's assertion that the performance of each of the operations managers entered into the calculation of what each manager was paid, this statement would be relevant but for the fact that McMurray states that he was unaware of any problems. The meaning of this evidence is unclear. It could mean that there were no such problems, but it could also mean that there were problems, but McMurray was not aware of such. Thus, the relevance of this testimony is questionable at best.

The next sentence at issue provides "When Forrester was hired, Dewayne Thomas made the decision regarding the machines on which Forrester would be trained." (Doc. 25 at 4, quoting McMurray Aff. at ¶ 6). The defendant argues that this sentence is due to be struck because it is not based upon personal knowledge and constitutes inadmissible hearsay. (Doc. 25 at 4). The court disagrees, McMurray was the terminal manager, and in fact hired the plaintiff. Under the circumstances, it is evident that McMurray's statement is premised on his personal knowledge and not hearsay. Because the defendant asserts that "the plaintiff did not have the same skills and experience" as the other operations managers, this evidence is relevant.

The next complained-of paragraph provides, "An operations manager does not need to be trained on heavy equipment. An operations manager does not have to run all of the individual equipment but has to understand the operations of the facility and the necessary quality of those operations." (Doc. 25 at 4, quoting McMurray Aff. at ¶ 7). The defendant argues that this sentence is due to be struck because it is not based upon personal knowledge, it is conclusory,

6

and it is irrelevant. (Doc. 25 at 5). Regarding relevance, the court finds that testimony

concerning the duties, responsibilities, and skills needed to act as an operations manager is

relevant. Because McMurray was both an operations manager and a terminal manager, he has

personal knowledge of such information. The court does find, however, that this testimony

necessarily is limited to the period he worked for the defendant. Regarding the claim that the

evidence is conclusory, the court finds that this paragraph may be reduced to admissible

testimony premised on the fact that it constitutes an opinion that is premised on McMurray's

observations, experience, and perception, and is likely to assist the jury. *See* FED. R. EVID. 701.

Therefore, it is not due to be struck.

The next sentence provides, "In most cases, operations managers were not trained on the

heavy equipment." (Doc. 25 at 5, quoting McMurray Aff. at ¶ 8). The defendant argues that this

sentence is due to be struck because it is not based upon personal knowledge, it is conclusory,

and it is irrelevant. (Doc. 25 at 5). This testimony is relevant on the issues of qualifications and

the reasons for differences in pay between the plaintiff and Cooper and Smith. It is, however,

limited in time to the period McMurray worked with the defendant.

The next paragraph provides, ". . . Forrester knew more about operating the terminal than

any employee, other than John Keller or myself. Forrester and Keller were equally

knowledgeable about loading the trains." (Doc. 25 at 5, quoting McMurray Aff. at ¶ 9). The

defendant argues that this sentence is due to be struck because it is not based upon personal

knowledge, it is conclusory, and it is irrelevant. (Doc. 25 at 5). The defendant also asserts that it

is due to be struck to the extent that it is premised on information derived from statements of

others. (*Id.*). The court makes a number of findings regarding this statement. First, it is due to

7

be struck in part premised on the fact that John Keller is not a comparator and his experience is irrelevant.  Second, to the extent it articulates Forrester's knowledge of terminal operations, it is permitted for the period that McMurray worked there only.  Third, absent some additional showing from the defendant, the court concludes that the statement is not impermissibly based on hearsay testimony.

The next sentence provides that "Tommy Smith and Steven Cooper were not as knowledgeable as Forrester regarding computer skills required in the position of ramp coordinator."  (Doc. 25 at 5, quoting McMurray Aff. at ¶ 10).  The defendant argues that this sentence is due to be struck because it is not based upon personal knowledge, it is conclusory, and it is based on inadmissible hearsay.  (Doc. 25 at 5).  Each of these objections are insufficient.  This opinion testimony is permitted by the Federal Rules of Evidence as noted already.  *See* FED. R. EVID. 701.  It is premised on McMurray's experience and observations while at ITS and is not based upon impermissible hearsay.  Its value is also limited, however, by his experience with the defendant.

The next paragraph provides, "Smith did not know how to load a train. . . .  Craig Wages and I discussed that Smith could not be left by himself with a train to load."  (Doc. 25 at 5, quoting McMurray Aff. at ¶ 11).  The defendant argues that these sentences are due to be struck because they are not based upon personal knowledge, they are conclusory, and they are based on inadmissible hearsay.  (Doc. 25 at 5-6).  The first sentence is admissible, subject to the foregoing time limitations.  The second sentence is clearly an out-of-court statement that is offered to impeach  Wages' evaluation of the managers.  It is therefore relevant on the issue of pretext.  To the extent it is offered for impeachment purposes, it would be admissible at trial.

8

The next paragraph provides, "Smith generated only basic reports required in the operations manager position.  Forrester generated much more detailed reports.  Forrester was a much better manager than was Smith."  (Doc. 25 at 6, quoting McMurray Aff. at ¶ 12).  The defendant argues that these sentences are due to be struck because they are not based upon personal knowledge, they are conclusory, and they are based on the statements of others.  (Doc. 25 at 6).  The first two sentences clearly are based on McMurray's personal observations and are permissible.  The third sentence is an inappropriate conclusion and is due to be struck.  *See Wyant v. Burlington Northern Sante Fe Railroad*, 210 F. Supp. 2d 1263, 1278 (N.D. Ala. 2002).

The next sentence provides, "Because Forrester loaded many more trains than other ramp coordinators, there existed a much greater chance for Forrester to have 'missed loads.'"  (Doc. 25 at 6, quoting McMurray Aff. at ¶ 13).  The defendant argues that this sentence is due to be struck because it is not based upon personal knowledge and it is conclusory.  (Doc. 25 at 6).  To the extent McMurray states that Forrester loaded a greater number of trains, the sentence will be considered based upon his observations at the time he worked for the defendant.  The remainder is conclusory and does not otherwise assist in the determination of the present issues as is required by Rule 701.  *See* FED. R. EVID. 701.

The next sentence states, "While Forrester loaded a train without assistance, Cooper and Smith had to have help from a railroad clerk, John Keller or Forrester."  (Doc. 25 at 6, quoting McMurray Aff. at ¶ 14).  The defendant argues that this sentence is due to be struck because it is not based upon personal knowledge, it is conclusory, and it is derived from the statements of others.  (Doc. 25 at 6).  The court fails to see how this evidence is derived from the statements of others.  To the contrary, the affidavit states that it is based on McMurray's personal knowledge.

9

(McMurray Aff. at p. 1).  It appears to be premised on his observations and, is therefore not conclusory.  It is limited by the length of his service with the defendant.

The next sentence states, "Forrester trained Cooper when he was promoted to ramp coordinator from working on the ramp."  (Doc. 25 at 5, quoting McMurray Aff. at ¶ 15).  The defendant argues that this sentence is due to be struck because it is not based upon personal knowledge and because it is based on statements and information from others.  (Doc. 25 at 6-7).  The court disagrees since McMurray was the terminal manager when Cooper was promoted (August 1998), there is no basis for the court to conclude that the testimony is improper.  (*See* Doc. 20, Brief at p. 4).

The next sentence states, "The night shift was more difficult to run than the day shift."  (Doc. 25 at 7, quoting McMurray Aff. at ¶ 23).  The defendant argues that this sentence is due to be struck because it is conclusory.  (Doc. 25 at 7).  The court finds that this is opinion testimony permitted by Rule 701, but its value is limited as already noted.  *See* FED. R. EVID. 701.

The next sentence states, "There was no guarantee made to operations managers that they would work on a specific shift."  (Doc. 25 at 7, quoting McMurray Aff. at ¶ 24).  The defendant argues that this sentence is due to be struck because it is not based upon personal knowledge, it is conclusory, and it is irrelevant.  (Doc. 25 at 7).  The defendant further asserts that it is based on inadmissible hearsay testimony.  (*Id.*).  This statement is allowed, but only to the extent that it represents McMurray's experience while he was employed by the defendant.[9]

The next sentence provides, "While I was terminal manager and an operations manager, I

---

[9] The court does note that this testimony is consistent with certain other testimony offered by the plaintiff to which the defendant has not objected.

was told that all ramp coordinators would receive the same pay." (Doc. 25 at 7, quoting McMurray Aff. at ¶ 24). The defendant argues that this sentence is due to be struck because it constitutes inadmissible hearsay. (Doc. 25 at 7). The court agrees. There is no attribution of this statement to any particular person. Therefore, it is hearsay and must be excluded from the court's consideration of the present motion for summary judgment.

The next challenged paragraph provides, "I and Steven Cooper worked on the ramp when needed, ~~and we received hourly pay for the extra work and duties. This work was done in addition to our pay for operations managers~~.[10] (Doc. 25 at 7, quoting McMurray Aff. at ¶ 26).[11] The defendant argues that this sentence is due to be struck because it constitutes inadmissible hearsay and because there is no indication the statement is based on personal knowledge. (Doc. 25 at 7). The court does not see the relevance of this evidence. It does not assist the court in resolving the issues before it and therefore will not be considered on the present motion for summary judgment.

The next statement is "Tommy Smith's crew would not follow his direction. ~~He was not a good manager of a crew. Craig Wages and I discussed Smith's deficiencies as a manager~~." (Doc. 25 at 7, quoting McMurray Aff. at ¶ 26). The defendant argues that the second sentence is due to be excluded because it is not based on personal knowledge and it is conclusory. The court agrees due to the limited period of overlap between McMurray's and Smith's tenures with the defendant. The defendant argues that the third sentence is due to be struck because it constitutes inadmissible hearsay. (Doc. 25 at 8). This statement is hearsay to the extent it is offered to show

---

[10] The court has recited the entire paragraph to place the objected-to portion in context. The "lined" portion of the paragraph is the objected-to material.

[11] McMurray's affidavit includes two paragraphs numbered "26." This statement is found in the first.

that Smith was a deficient manager. However, to the extent it is offered to demonstrate pretext concerning Wages's assessment of Smith, it is allowed.

Lastly, the defendant objects to the statement that "Forrester had more knowledge, experience and expertise in operations management than did Smith and Cooper." (Doc. 25 at 8, quoting McMurray Aff. at ¶ 28). The defendant argues that this sentence is due to be struck because it is not based upon personal knowledge and it is conclusory. (Doc. 25 at 8). The court disagrees. McMurray did have an opportunity to work with and observe all three individuals. His opinion is limited, however, to the period he was there and not the time thereafter.

In sum, the defendant's motion to strike is due to be granted in part and denied in part as stated above.

## SUMMARY JUDGMENT

### Standard

Summary judgment is to be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the declarations, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The party asking for summary judgment "bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided by trial. Only when that burden has been met does the burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142

(1970).

The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of her case on which she bears the ultimate burden of proof. *Celotex,* 477 U.S. at 322-23; *see* FED. R. CIV. P. 56(a) and (b). Once the moving party has met her burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324. The nonmoving party need not present evidence in a form necessary for admission at trial; however, the movant may not merely rest on the pleadings. *Id.*

After a motion has been responded to, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). "[T]he judges's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249.

### Discussion

The plaintiff asserts equal pay and disparate treatment claims. The defendant's motion correctly challenges only her disparate treatment claim, as there clearly are issues of material fact

on the equal pay claim.[12]  The plaintiff alleges that she was subjected to disparate treatment because she was paid less for performing the same job duties as her male counterparts – Cooper and Smith.

As is the situation in most disparate treatment cases, the primary issue is whether the defendant intentionally discriminated against the employee because of her gender or on some other improper consideration.  *See U.S. Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 715, 103 S. Ct. 1478, 75 L. Ed. 2d 403 (1983).  Discriminatory intent can be established through either direct or circumstantial evidence.  *See id.* at 714 n.3, 103 S. Ct. 1478.  The appropriate framework from which to evaluate the plaintiff's claim when circumstantial evidence is involved is under the familiar burden shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and *Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981).[13]  Under this framework, the Title VII plaintiff has the initial burden of establishing a prima facie case of discrimination.  *See McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. at 1824.

In *Meeks v. Computer Associates Intern.,* 15 F.3d at 1013, 1019 (11th Cir. 1994), the Eleventh Circuit Court of Appeals stated:

> Under the *McDonnell Douglas/Burdine* approach, a female Title VII plaintiff establishes a prima facie case of sex discrimination by showing that she occupies a job similar to that of higher paid males. *Miranda*, 975 F.2d at 1529. Once a prima facie case is established, the defendant must articulate a "legitimate, non-discriminatory reason for the pay disparity." *Id.* (citing *Burdine*, 450 U.S. at 255-56, 101 S. Ct. at 1095). This burden is "exceedingly light"; the defendant must merely proffer non-gender based reasons, not prove them. *Id.* (quoting

---

[12] To the extent that the defendant moves for summary judgment on any retaliation claim, the motion is moot because the plaintiff's counsel acknowledged at oral argument that the plaintiff is not making any such claim.

[13] The plaintiff does not assert that there is any direct evidence of discrimination in this case.

> *Perryman v. Johnson Prod., Inc.*, 698 F.2d 1138, 1142 (11th Cir. 1983)).  Once
> such a justification is advanced, the plaintiff must demonstrate by a
> preponderance of the evidence that the employer had a discriminatory intent.  In
> other words, the plaintiff must show that "a discriminatory reason more likely
> than not motivated [the employer] to pay her less." *Id.* (citing *Burdine*, 450 U.S.
> at 256, 101 S. Ct. at 1095). . . .

The court also stated that if "the evidence is in equipoise on the issue of whether a salary

differential is based on a 'factor other than sex,'" the employer prevails on the Title VII claim.

*Meeks*, 15 F.3d at 1019.

The parties do not dispute that the plaintiff is a member of a protected group or that her

salary was different than that of certain male employees.  To the extent that the defendant

obliquely suggests that the plaintiff is not qualified for the position of day operations manager,

the court finds otherwise.  The plaintiff successfully has performed her job for approximately

four and one-half years.  This is sufficient under the present circumstances.  This is especially

true since she continues to work for the defendant. *See Damon v. Fleming Supermarkets*, 196

F.3d 1354, 1360 (11th Cir. 1999) ("in cases where a plaintiff has held a position for a significant

period of time, qualifications for that position sufficient to satisfy the test of a prima facie case

can be inferred").

The parties do dispute the reason for the differential in pay.  The defendant asserts the

following as its legitimate, nondiscriminatory reasons for its decision to pay Cooper and Smith a

higher salary:

> The undisputed facts of this case clearly show non-gender based reasons
> for the pay disparity between the plaintiff and Cooper and Smith.  The plaintiff
> worked the night shift and had very little, if any, contact with ITS' customer,
> BNSF.  Her job responsibilities were very different than those of Smith and
> Cooper.  Importantly, BNSF had great confidence in these two operations
> managers and insisted that they remain employees of ITS.  Their experience,

qualification, performance, job duties and customer satisfaction far exceed the necessary justification for their increased pay. . . .

(Doc. 20, Brief at 9).  The plaintiff asserts this reasoning is merely pretext for the true reason for the differential, that she is a female.

The initial issue is whether the defendant has adequately articulated its legitimate, nondiscriminatory reason or reasons for the pay differential.  The plaintiff contends that the defendant has not adequately articulated its reason or reasons.  In *Chapman v. AI Transport*, 229 F.3d 1013, 1034 (11th Cir. 2000) (en banc), the Eleventh Circuit stated that "'the defendant's explanation of its legitimate reasons must be clear and reasonably specific' so that 'the plaintiff [will] be afforded a full and fair opportunity to demonstrate pretext.' *Burdine*, 450 U.S. at 258, 101 S. Ct. at 1096 (quotation omitted)."  The court further stated, "A subjective reason is a legally sufficient, legitimate, nondiscriminatory reason if the defendant articulates a clear and reasonably specific factual basis upon which it based its subjective opinion."  (*Id.*).  The court further provided an example:

> Continuing our example of a sales clerk or wait staff position, it might not be sufficient for a defendant employer to say it did not hire the plaintiff applicant simply because "I did not like his appearance" with no further explanation. However, if the defendant employer said, "I did not like his appearance because his hair was uncombed and he had dandruff all over his shoulders," or "because he had his nose pierced," or "because his fingernails were dirty," or "because he came to the interview wearing short pants and a T-shirt," the defendant would have articulated a "clear and reasonably specific" basis for its subjective opinion--the applicant's bad (in the employer's view) appearance.  That subjective reason would therefore be a legally sufficient, legitimate, nondiscriminatory reason for not hiring the plaintiff applicant.  The burden would then shift back to the plaintiff to offer sufficient evidence for a reasonable factfinder to find that the defendant's reason was pretext for discrimination.

*Chapman*, 229 F.3d at 1034 (footnote omitted).

16

Although the defendant's articulated reasons quoted above are terse, they are sufficient to meet the *Chapman* standard. They are sufficiently articulated to allow the plaintiff a fair opportunity to articulate pretext. *Chapman*, 229 F.3d at 1034.

The next preliminary issue concerns who are the appropriate comparators for further analysis of this matter. The inquiry is whether the persons to whom the plaintiff seeks to compare herself were performing "substantially similar" jobs. *Mulhall v. Advance Security, Inc.*, 19 F.2d 586, 590 (11th Cir.), *cert denied*, 513 U.S. 919, 115 S. Ct. 298, 130 L. Ed. 2d 218 (1994). The court finds that the individuals occupying the operations manager positions were performing "substantially similar" jobs. These individuals include the plaintiff, Cooper, Smith, Debra Nix, and Randy Ballard. The defendant has not satisfied the court that there is any reason to distinguish between these individuals or the positions they occupied. They all hold or have held the same title and are performing or have performed similar duties. The distinctions between the duties of the operations manager on the day shift as compared to the night shift, while noteworthy, are not sufficiently distinct. The testimony is clear that the plaintiff was able to work both the night shift and the day shift as an operations manager. (Wages Dep. at 12-13).[14] Wages testified that the plaintiff, on occasion, had worked the day shift even though she was assigned to work at night. (*Id*. at 12-14).[15] Huston described the job of "operations manager" during his deposition:

> Q.  With regard to the Birmingham terminal, tell me what an operations

---

[14] Wages's deposition is located at document 20, exhibit 8.

[15] Cooper's testimony was simply that they all held the same title. (Cooper Dep. at 20). He did not state that they performed the same job. (*Id*.).

manager does on a daily basis.

A. First of all his primary duties are to supervise the loading and unloading of trains and to supervise the people involved in performing those tasks. That's their primary duty. Secondary duties are compiling a daily plan, a twenty-four hour plan, ensuring that the railroad is aware of that plan and any changes to that plan. And there are certain reports that they have to compile based on trained performances. They oversee the gate employees, investigate accidents and injuries if they occur. That's basically it.

Q. And those duties, both primary and secondary, would apply to everyone holding an operations manager position?

A. Yes, to an extent. The planning portion of it is done more on the day side, early in the morning. I mean, that's when the plan is put together for a twenty-four-hour period. So from a planning standpoint, there's not as much planning, say, in the afternoon and the evening hours as there is in the morning hours. There may be some slight changes that need to be made. The planning and the conference calls that they conduct with the railroad is done most of the time in the daylight hours because that's when the railroad representatives are on the property and/or at the corporate office in Ft. Worth.

Q. Do all operations managers have to be prepared to work both the night and day shifts?

A. That would be -- that's ultimately what you would - - you would want. You would want them to be able to work either night or day, yes.

. . . .

Q. So they should be able to handle all aspects of what you listed as job duties?

A. Should be, yes.

(Huston Dep. at 17-18). The distinctions suggested by the defendant are not significant enough for this court to find that the positions were not "substantially similar." Additionally, the plaintiff testified that all the operations managers have to be able to perform the same functions. (Forrester Dep. at 164). Thus, the operations manager positions, whether the day or the night position, are sufficiently similar for comparison purposes.

18

The court must therefore next analyze whether the plaintiff has sufficiently challenged the

defendant's articulated reasons for the pay distinctions.  As the Eleventh Circuit Court of

Appeals stated in *Mulhall*:

> Plaintiff must then demonstrate that the employer's "legitimate" reason
> was in fact, pretextual.  Courts have long recognized that an employer's true
> motivations are especially difficult to establish, making such factual
> determinations "generally unsuitable for disposition at the summary judgment
> stage." *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 919 (11th Cir. 1993);
> *United States Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 716, 103
> S. Ct. 1478, 1482, 75 L. Ed. 2d 403 (1983).  At summary judgment, plaintiff's
> burden is simply to raise a genuine factual question as to the existence of pretext.
> "The plaintiff is not required to introduce evidence beyond that already offered to
> establish the prima facie case." *Hairston*, 9 F.3d at 921; *Burdine*, 450 U.S. at 256
> n.10, 101 S. Ct. at 1095 n.10 ("Indeed, there may be some cases where the
> plaintiff's initial evidence, combined with effective cross-examination of the
> defendant, will suffice to discredit the defendant's explanation.")  Summary
> judgment is appropriate when evidence of discriminatory intent is totally lacking.
> *Id.*  This will seldom be the case when the "elusive factual question" of intentional
> discrimination is involved.  *Id.*

*Mulhall*, 19 F.3d at 598.

As just noted, the defendant's reasons can be considered collectively or individually.

However, to overcome the defendant's motion for summary judgment, "the plaintiff must

produce sufficient evidence for a reasonable factfinder to conclude that each of the employer's

proffered nondiscriminatory reasons is pretextual." *Chapman*, 229 F.3d at 1037.  Accordingly,

the court must examine the defendant's reasons individually.

The defendant's first reason is that "[t]he plaintiff worked the night shift and had very

little, if any, contact with ITS' customer, BNSF." (Doc. 20, Brief at 9).  The court finds this terse

statement has been adequately challenged by the plaintiff.  She has demonstrated that simply

because she worked the night shift, which involved some job duties that were distinct from the

19

activities performed by the day managers, this does not justify a pay differential. This is especially true since she also was capable of and did in fact work occasionally on the day shift. Additionally, the absence of contact with the customer is not, in and of itself, sufficient to justify the differential.

The defendant's second reason, that the plaintiff had different job responsibilities, has been challenged effectively by the plaintiff as is demonstrated above. (Doc. 20, Brief at 9). Specifically, the court finds that "the plaintiff has demonstrated 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997), *cert. denied*, 522 U.S. 1045, 118 S. Ct. 685, 139 L. Ed. 2d 632 (1998). By way of example, the foregoing discussion demonstrates that the plaintiff was able to perform and did perform the other responsibilities effectively. Her effectiveness as an operations manager was demonstrated by the fact she worked the day shift on occasion and the fact that after the plaintiff had undergone a significant medical procedure, the defendant, specifically McMurray, asked her to return to work earlier than her doctor had prescribed because she was needed. (Forrester Dep. at 166). Although the testimony showed that she did misdirect some cargo loads while performing as an operations manager, those are matters that are more appropriately left for the jury's consideration.

The defendant's third reason is that BNSF had great confidence in Smith and Cooper and insisted that they remain employees of the defendant. (Doc. 20, Brief at 9). In support of this reason, the defendant states in its brief that "[d]uring the time period involved, BNSF manager

20

Larry White expressed very high opinions of operations managers Tommy Smith and Steven Cooper. According to Craig Huston, decisions were made to give raises to Smith and Cooper because the railroad wanted them to stay as ITS operations managers." (Doc. 20, Brief at 5 (citing Huston Dep. at 36-37)). The defendant offers no other argument in support of this reason.

During the relevant period, Huston was the Regional Manager for the East Region. (Huston Dep. at 7-10). He was sent to Birmingham to assist Regional Manager Dewayne Thomas who did not have the time to deal with issues in Birmingham because of problems elsewhere. (*Id*. at 10). The problems included "[l]ate trains, late inbound groundings, just non performance." (*Id*. at 11). The customer, BNSF, was "not happy" with the defendant's "management corps in Birmingham." (*Id*.). These managers included the terminal manager, McMurray, and the operations managers. (*Id*.). When Huston arrived in Birmingham, he demoted McMurray to an operations manager. (*Id*. at 11-12). This action was precipitated by the perception of BNSF that he was not capable of doing the job. (*Id*. at 12). Huston stayed in Birmingham about four to six months, until he hired Wages as the terminal manager. (*Id*. at 12-13).

Huston stated that in examining the quality of work of the operations managers, "the movement of containers and trailers on and off of rail cars, on-time departures of outbound trains, [and] timely deramping of inbound trains" is what is factored. (Huston Dep. at 27, 35). He also stated that the railroad's perception of the manager is also a major factor because the railroad is the customer. (*Id*. at 27, 35). One of the other significant factors in determining pay was the amount the local customer was paying the defendant in the particular area for ITS's services. (*Id*. at 16, 33-34).

21

Huston stated that Larry White, the BNSF manager, provided "feedback" regarding the performance of the managers. (Huston Dep. at 35-36).[16] Regarding his conversations with White, Huston stated the following:

> Well, he (White) was -- he was very high on Steve Cooper, very high on Steven Cooper. He -- and one of the biggest reasons he was is because he presented himself well on the phone with railroad officials out of their corporate headquarters in Ft. Worth. And Steve did a good job. So he was very, very high on Steve Cooper.
>
> He -- he was very high on Tommy Smith, especially considering that Tommy had very little railroad experience. He had supervisory experience, but he didn't have any railroad experience but caught on very quick. And probably his number one coordinator was a gentleman named John Keller. He was very high on John.

(*Id*. at 36-37). Huston described White's assessment of the plaintiff as "adequate." (*Id*. at 37). Huston attributed this marginal rating to certain "misloads"[17] she had experienced, the fact that he (White) did not feel as though she was "hands-on" enough from a supervisory standpoint, and that he (White) questioned certain judgment calls she had made on manpower issues. (*Id*. at 38). According to Huston, Wages talked with the plaintiff about these issues. (*Id*.).[18]

Concerning Smith, Huston further stated that Smith was given a "merit increase" because of his performance and the fact that Huston "wanted to retain him as an employee."[19] (Huston Dep. at 53). Smith had another job offer and Huston was concerned that Smith might accept it because it paid more money. (*Id*.). Huston wanted to retain Smith because of BNSF's desire to

---

[16] These conversations were not documented in writing.

[17] As expected, this means that goods were sent to the wrong destination. (Huston Dep. at 37-38).

[18] No documentation of these conversations was produced. (Huston Dep. at 39).

[19] This was done on April 4, 2000. (Huston Dep. at Ex. 4).

keep him.  (*Id*.).[20]  Huston had increased Cooper's salary for the same reason[21] about seven months earlier.[22]  (*Id*. at 55).

To accommodate these salary increases, Huston did not fill a fifth operations manager position which was allocated in Birmingham.  (*Id*. at 55-56).  He also did not increase the salary of the other managers, including the plaintiff, because he felt their performance was not up to that of Cooper and Smith.  (*Id*. at 59-60).  Huston further explained the distinction between the plaintiff and Cooper by stating that Cooper "was more hands-on with the hourly employees.  He supervised them more thoroughly.  He didn't sit in the office all day and expect things to happen. He was very good at planning and following through with the plan, making adjustments on manpower where necessary. . . [and] the railroad was very -- very pleased with his presence and his knowledge just in general."  (*Id*. at 61).  He also distinguished the plaintiff from Smith by stating that Smith's performance was similar.  (*Id*.).

The pertinent question is whether the plaintiff has offered "sufficient evidence for a reasonable factfinder to find that the defendant's reason was pretext for discrimination." *Chapman*, 229 F.3d at 1034.  The plaintiff asserts that she has sufficiently challenged the defendant's reasons because (1) when she told Wages she was going to seek employment elsewhere because of the salary differential, he simply asked her when she was leaving so he could hire Randy Ballard, (2) there was no documentation of any conversations between Huston

---

[20] This increase was listed as a "merit" increase on his personnel record.  (Huston Dep. at Ex. 4).

[21] Huston believed that Cooper had another job offer as an over-the-road driver and the railroad (BNSF) "absolutely" did not want to lose him.  (Huston Dep. at 55-56).

[22] Cooper's salary was increased on August 23, 1999.  (Huston Dep. at Ex. 5).  It was listed as a "re-eval of existing [salary]."  (*Id*.).

and White concerning Smith and Cooper's performance, and (3) the reasons Huston listed as to why he thought that White was not as "high" on the plaintiff either never occurred or never were communicated to the plaintiff. (Doc. 23 at 18).

The plaintiff's first challenge is not sufficient. The fact that Wages asked her when she was leaving and told her that he was going to hire Ballard is not evidence of pretext. The plaintiff's assertion that BNSF was never given the opportunity to express its feelings that it did not want to lose the plaintiff (doc. 23 at 17) is also not evidence of pretext. The record demonstrates that White considered her service "adequate." There is no indication anywhere that BNSF was interested in seeing that the plaintiff be retained.

The second challenge also is not sufficient. There is no requirement that there be some type of contemporaneously prepared documentation supporting the reasoning advanced by the defendant at this stage. The plaintiff cites no authority that requires the same and the Eleventh Circuit Court of Appeals has never required such. In *Chapman*, the Eleventh Circuit noted, when discussing an interview and selection process, that "we have never held that an employer cannot rely upon reasons that are not written down in advance of the selection, and we decline to do so now." *Chapman*, 229 F.3d at 1035 n.26. Under the circumstances, the court does not find the fact there was no contemporaneously prepared documentation of any conversations between Huston and White concerning Smith and Cooper's performance sufficient to demonstrate pretext.

The third challenge, that Huston was told by White that he was "high" on Cooper and Smith and that he wanted to keep the client (BNSF) satisfied also is challenged by the plaintiff. She asserts that the events upon which that assessment is premised either never occurred or the events, such as purported "misloads," which led to White's determination that he was not as

24

"high" on the plaintiff were never communicated to her.  (Doc. 23 at 18).

Huston testified that Wages talked with the plaintiff about misloads.  (Huston Dep. at 38).

Wages testified that he talked with the plaintiff about misloads because of the costs and client

issues involved.  (Wages Dep. at 15, 18-22).  The parties dispute the total number of misloads

that involved Forrester and the time period of such occurrences.  The defendant asserts there

were six misloads.  (*Id*. at 19).  The plaintiff asserts that she never missed six loads in any twelve

month period.[23]  (Forrester Dep. at 165).  There is no evidence in the record that indicates that

White attributed any misloads to either Cooper or Smith or that he was aware of any misloads by

them.  Nothing in the record demonstrates that White's assessment of Cooper and Smith was not

his legitimate assessment of them.  White was never deposed.  His assessment of Cooper and

Smith may not have been accurate, especially in the plaintiff's perception.  However, nothing

shows that it was not, in fact, his assessment.  Thus, the pertinent question becomes whether the

plaintiff has sufficiently challenged this reason for the pay differential so as to state a jury

question on her Title VII claim.  The court does not find that she has under the circumstances.

Through discovery, briefing the relevant issues, and at oral argument, the plaintiff was

afforded an opportunity to address and rebut White's assessment of Cooper and Smith and his

communication of the same to the defendant.  Nothing before the court refutes the defendant's

assertion that the pay raises were premised on White's assessment and his desire to keep Cooper

and Smith.  Although the plaintiff has demonstrated a sufficient basis for disagreeing with

White's assessment, she has not shown that the purported assessment of Cooper and Smith was

---

[23] The plaintiff acknowledged at her deposition that she may have misloaded six shipments during the entire four and one-half to five years she worked as an operations manager prior to her deposition.  (Forrester Dep. at 165).

not truly his or that he did not communicate to Huston both that assessment and his desire that
ITS retain Cooper and Smith.  Accordingly, the court finds that summary judgment is due to be
granted on the Title VII disparate treatment claim.[24]

The plaintiff asserts that "she should not be penalized for the lack of contact [she had
with BNSF] because the lack of contact stemmed from her doing her job duties at night, when
railroad officials were not present." (Doc. 23 at 18-19).  She further states, "It would be far too
easy for an employer to limit a female's contact with a client while fostering a male's contact
with a client and using that contact and the client's perception of those with whom it works more
closely as a criterial for [a difference in] payment." (*Id.* at 19).  It is undisputed that the plaintiff
preferred to work the night shift. (Forrester Dep. at 97).  There is no evidence that the defendant
used the night shift as a means of treating the plaintiff differently for purposes of Title VII.  Thus,
this contention is without merit in view of the circumstances presented herein.

With regard to the defendant's next reason for the distinction between the plaintiff's
salary and that of Cooper and Smith, the difference in their experience, qualifications,
performance, and duties, the court finds that the plaintiff has sufficiently challenged this reason.
The record, when considered in a light most favorable to the plaintiff, shows that she was well
versed with the job at the time she was hired and that she possessed the necessary skills to
perform the operations manager job. (*See* McMurray Aff. at ¶ 4).  As already noted, she worked
both shifts.  She had no negative performance reviews and did not experience any problems in
supervising her crews.  In contrast, Smith, at least during the time McMurray was employed by

---

[24] The court does find that the evidence, in a light most favorable to the plaintiff, establishes that she had at least equal,
if not greater, experience and expertise in operations management than Smith and Cooper.  However, what she has failed to assail
is White's assessment.

the defendant, "did not know how to load a train" and he had to have help from a railroad clerk. (McMurray Aff. at ¶¶ 7, 14). He had no prior railroad experience as an operations manager. (Huston Dep. at 37). Similarly, McMurray states that Cooper, during the time that McMurray was with the defendant, also required help from a railroad clerk or Forrester to load a train. (McMurray Aff. at ¶ 14). The plaintiff also challenges this reason by pointing out that she trained Cooper when he was promoted to ramp coordinator. (*Id.* at 15). In sum, the plaintiff has sufficiently challenged the defendant's assertion that Cooper and Smith had more experience, were better qualified, and performed better. But for the evidence concerning BNSF's assessment of Cooper and Smith and its (White's) desire for their continued employment, summary judgment would be due to be denied.

To the extent that the defendant asserts that the motion is due to be granted because another male operations manager, Randy Ballard, was paid less than the plaintiff and another female manager, Debra Nix, the court does not find this alone to be sufficient to warrant the granting of the motion. The defendant cites no authority in support of this position. Simply because Ballard was paid less does not mean that a reasonable jury could not find that the defendant discriminated against the plaintiff. The defendant is not entitled to summary judgment on this basis.

## CONCLUSION

Premised on the foregoing the defendant's motion to strike (doc. 25) is due to be and hereby is denied in part and granted in part and the defendant's motion for summary judgment (doc. 20) is due to be and hereby is granted on the plaintiff's Title VII disparate treatment claim. The plaintiff's equal pay claim will be set for trial by separate order.

**DONE**, this the _1th_ day of March, 2003.

**JOHN E. OTT**
United States Magistrate Judge